UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **David Michael Donnell,**<br><br>         **Plaintiff,**<br><br>v.<br><br>**Capital One Services, LLC,**<br>**Capital One Financial Corporation, and**<br>**Capital One, National Association,**<br><br>         **Defendants.** | **CIVIL ACTION NO.** _____ |

**COMPLAINT**

Plaintiff David Michael Donnell ("Plaintiff" or "Donnell") respectfully moves for judgment against Defendants Capital One Services, LLC, Capital One Financial Corporation and Capital One, National Association, (collectively "Capital One" or "Defendants"):

**Introduction**

1. This is a claim for relief pursuant to Older Workers Benefits Protection Act (OWBPA), and subject to this Court's ruling on the OWBPA claim, should Plaintiff prevail on such claim, then Plaintiff asserts a corresponding claim under the Age Discrimination in Employment Act (ADEA). Plaintiff was employed by Capital One, and upon his termination signed a "Letter of Agreement" purporting to release his claims under ADEA. Plaintiff alleges that he was terminated pursuant to an employment termination program and that the Letter of Agreement failed to comply with the OWBPA requirement of 45-day consideration period and a listing of names and job titles of others affected by the program. Plaintiff is entitled to keep his

1

severance payment and sue Capital One for age discrimination. *Oubre v. Entergy Operations*, 522 U.S. 422 (1998). Plaintiff may sue for an OWBPA violation. *Krane v. Capital One*, 314 F. Supp. 2d 589 (E.D.Va. 2004) (Payne, J.). In conjunction with Plaintiff's assertion that the Letter of Agreement did not comply with OWBPA, Plaintiff seeks relief for age discrimination under ADEA.[1]

2. Although Plaintiff intended to bring this as a collective action under 29 U.S.C. § 216(b), this action is governed by the Court's June 8, 2020 decision in *Hutchens v. Capital One Services, LLC, et al.*, Case No. 19-cv-546, on an identical "Letter of Agreement" that was at issue in *Hutchens* and under which this Court has held that a collective action could not proceed.[2]

## Jurisdiction and Venue

3. This Court has jurisdiction for his ADEA claims pursuant to 29 U.S.C. § 216(b) as incorporated by 29 U.S.C. § 626(b), and under 29 U.S.C. § 626(c), in that the Plaintiff may bring this action in any appropriate United States District Court.

4. Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5. Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

## Parties

---

[1] Other Plaintiffs have asserted similar OWBPA claims that are currently pending in related cases. Plaintiff anticipates that these individual claims, and defenses thereto, give rise to common issues which will be addressed by the Court in a coordinated or consolidated fashion.
[2] Plaintiff reserves all rights, including to amend this action, to the extent this Court or a higher Court ultimately reverses the *Hutchens* holding, allowing collective action to proceed with other similar cases against Defendants.

6.Donnell is a resident of Virginia who was employed by Capital One most recently as a Master System Integrator.  Plaintiff was an "employee" as defined in the ADEA.

7.Capital One Services, LLC is a Virginia limited liability company, which has its principal office in Virginia.

8.Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

9.Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

10.On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent.  Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants.  Defendants are an "employer" as defined by the ADEA.

## Factual Allegations

11.Donnell was first hired by Capital One in 1994 and worked for the company until 2007. He was then rehired by Capital One as a contractor in 2009, and subsequently re-hired as full-time employee of Capital One in or around 2010.

12.During the time frame relevant to this lawsuit, Donnell worked as a Master System Integrator in the Finance Technology department for Capital One and, in July 2018, was 58 years old.

## Performance Management Overview

13.Capital One uses five categories for its performance evaluation ratings scale:

Exceptional, Very Strong, Strong, Inconsistent, Action Required.

14. Capital One informally refers to each of these five categories as "buckets."

15. As part of the evaluation process each year, Capital One employees are issued an overall rating which places them within one of the five "buckets." This overall rating consists of two areas:

    a. Objective metrics designated as "Results;" and

    b. Subjective criteria "designated as Competencies" (including factors such as "communications," and "lives the values").

16. During his employment with Capital One, Johnson regularly received an overall rating of "Strong" his evaluations.

### Age-Based Policy to Increase "Involuntary Attrition"

17. Plaintiff alleges that, during the relevant time periods, age was a factor in Capital One's determination of who would be selected for "involuntary attrition" or lay-off - either directly as disparate treatment or through the age-discriminatory impact of its policies and practices.

18. Capital One achieved this by:

    a. Requiring managers to involuntarily terminate a greater percentage of employees across all business units ("involuntary attrition") compared to Capital One's previous rates of involuntary attrition;

    b. Requiring managers to rank set percentages of employees as poor performers ("forced rankings" or "forced distribution");

    c. Requiring managers to identify jobs for elimination ("Restructuring").

19. Capital One claims to hire the best and brightest associates available. For

example, Chief Information Officer Rob Alexander stated in a blog post on July 19, 2017 that Capital One has a "best people philosophy," which involves hiring the "best talent in the industry."

20. In practice, the directive to increase the rate of "involuntary attrition" was implemented against older workers and was based on subjective age-stereotyping rather than objective performance or "restructuring" measures, and was contradictory to Capital One's "best people philosophy."

21. During the relevant time period and to decrease the numbers of older workers, Capital One implemented a policy that sought to increase Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination.

22. In order to increase "involuntary attrition" Capital One changed or implemented other personnel policies, including:

    a. Prohibiting employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy);

    b. Changing from a "performance management" distribution that was a "guide" or "aspirational" distribution (previously as low as 5% in the bottom two "buckets"), to a <u>mandatory</u> forced distribution;

    c. Changing prior policy (which only required a "coaching plan" or PIP for employees in the "Action Required" bucket), to also require a coaching plan or PIP for all employees rated in the "Inconsistent" bucket;

    d. Identifying jobs or positions for elimination which is known within Capital One as "Restructuring."

23. The No-Transfer policy that went into effect was that any employee rated

"Inconsistent" was prohibited from transferring to another role within Capital One without special dispensation from a VP-level executive.  Individual discretion of managers to accept transfers of employees rated "Inconsistent" was prohibited. Previously employees rated "Inconsistent" were allowed and encouraged to find other roles within Capital One (based on its "best people philosophy"), and the hiring managers had wide discretion to approve, and routinely did approve, such transfers.

24. However, the most significant change in Capital One policy was that it intentionally sought to increase its rate of "involuntary" terminations.

25. Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

26. At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job eliminations ("Restructuring").

27. Upon information and belief, Capital One required its managers to involuntarily terminate a set percentage of its employees across all business units.

28. The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One, believed to be at the CEO and the Executive Committee (EC) level, (the highest echelon of executive leadership at Capital One).

29. "Performance Management" was the primary means by which this central policy of increasing "involuntary attrition" rates was implemented.

30. At Capital One the term "distribution" means the range of performance ratings set for each "bucket" of performance. Previously the "distribution" percentages set for each "bucket" was aspirational. During the relevant time period of this lawsuit, Capital One's

"distribution" percentages were mandatory.

### Performance Management - Forced Distributions/Stack Rankings

31. This "Performance Management" policy of forcing managers to rank a fixed percentage of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

32. Under the guise of "Performance Management," the Executive Committee (EC) members, (the highest echelon of executive leadership at Capital One), determined the specific forced "distribution" percentages applicable to their lines of business. Managers within those lines of business had to meet the forced distribution resulting in a fixed percentage of employees ending up in each of the performance "buckets" as pre-determined by the EC executive.

33. From the bottom two "buckets," employees were placed on "coaching plans" or "performance improvement plans" ("PIPs").

34. Employees who, through "Performance Management" were forced into the bottom two buckets or placed on "coaching plans" and "PIPs," were the pool from which managers then would identify the ultimate target of "involuntary" terminations.

35. In addition to "Performance Management," Capital One engaged in some restructuring in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

36. Elsewhere in the private sector, where an employer requires a set percentage of employees to be ranked as poor performers, this practice is commonly called "stack rankings." (*See, e.g.* Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

37. Stack rankings provide a platform for falsely ranking employees who are

objectively meeting all performance expectations as poor performers. Use of this vehicle to discriminate against older workers violates the ADEA. Use of this policy or practice in a manner that has an age-discriminatory impact on older workers violates the ADEA.

38. Falsely giving employees who objectively met performance targets poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy. On information and belief, older workers, such as Plaintiff, were intentionally or disproportionately affected by such policy of stack rankings.

39. The Requirement that a fixed percentage of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and ultimately terminated.

40. Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates across all lines of business.

### Focus on Younger Replacements

41. The practice of ridding a workforce of older "blockers" holding positions that younger workers could assume has been held to violate the ADEA. *See, e.g. Ryder v. Westinghouse Electric Corp.,* 128 F.3d 128 (3rd Cir. 1977) (informal statements of managerial attitudes admissible on intent, culture atmosphere and corporate); *see also Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379 (2008) (pattern or practice testimony admissible under FRE 401, 403, within the discretion of the trial court, where allegation states application to unfavorable treatment to a group by differing supervisors; interpreting claim under ADEA).

42. Through "involuntary attrition" of current employees, Capital One was making

room for younger employees pursuant to a marketing, recruiting, and hiring campaign to attract recent college graduates.

43. "Our No. 1 principle is to attract really talented people," [Capital One VP of Human Resources Judy] Pahren says. "We know our success is dependent on talent." Recruiting younger workers like millennials, she adds, "is key to that strategy." *See* Virginia Business Magazine, The Rise of Millennials, November 2019.[3]

44. Capital One's effort to higher younger workers came through its Campus Recruiting Program ("CRP"), which focused on hiring only recent college graduates.

45. Within the past two years the CRP has been open only to college graduates in classes 2017 to 2021. Based on the general age of college graduates between the years of 2017 and 2021, Capital One has essentially set its hiring criteria to candidates in their early to mid-20s.

46. Currently, Capital One's website makes clear that its "Full-Time Programs" in the CRP are limited only to college graduates from the classes of 2019 to 2021. (https://campus.capitalone.com, visited December 22, 2020). The website directs anyone who graduated before 2019 to apply for jobs to Capital One's main site, separate from the CRP programs:

---

[3] Available at https://www.virginiabusiness.com/article/the-rise-of-the-millennials/ (last accessed Dec. 4, 2020).



(https://campus.capitalone.com/full-time-programs/, visited December 22, 2020) (red circle added, link redirecting to https://www.capitalonecareers.com/search-jobs).

47. In order to make room for the new CRP recruits in their early to mid-20's, Capital One intentionally increased its "involuntary attrition" rate, that is the rate at which employees are involuntarily terminated from their employment with Capital One.

48. In order to increase its "involuntary attrition" rate and to make room for new hires in their early to mid-20's through the CRP program, Capital One required its managers to engage in: the forced distribution, stack rankings, and issuance of "coaching plans" and "PIPs," under the guise of "performance management;" and job eliminations ("Restructuring.").[4]

**Termination of Donnell**

49. Capital One's termination of Donnell did not arise out of individual

---

[4] In prior ADEA/OWBPA collective actions against Capital One, these defendants have faced allegations that they previously used forced distribution to meet attrition goals. *See e.g.*, *Feltman, et al. v. Capital One*, Case No. 3:02-cv-894, and *Krane v. Capital One*, Case No. 3:03-cv-675.

circumstances. It was a result of Capital One's mandate requiring managers to increase "involuntary attrition."

50. In mid-October 2017, Donnell was present for group meeting held by his manager, Dan Eres (age 34), in which Mr. Eres told the group that in order to meet Capital One's forced ranking requirements for 2017, management was forced to apply the following percentage distribution to annual performance ratings: (1) Exceptional and Very Strong – 33.33%, (2) Strong – 33.33%, (3) Inconsistent and Action Required – 33.33%.

51. On information and belief, Capital One managers, including Mr. Eres, were expected to greatly expand the percentage of "Inconsistent" and "Action Required" ratings that were assigned to employees as compared to years prior. On further information and belief, because the directive was given to management after nearly 80% of the review cycle for the year was over, managers were forced to engage in skewed performance evaluations and terminations in order to meet the new percentages.

52. In early 2018, Donnell was rated overall "Inconsistent" for his performance in 2017.

53. Donnell disputes that the low rating matched his objective job performance. In fact, Donnell received "Strong" ratings in four categories and "Very Strong" ratings in two areas. By assigning Donnell an overall rating of "Inconsistent", Capital One put inexplicable emphasis on certain categories, despite the bulk of the review showing Donnell to be performing strongly.

54. The low rating was the result of Capital One's "forced" rankings.

55. In March 2018, Donnell was issued a "coaching plan." The "coaching plan" was based on fabricated metrics that had little to no relevance to Donnell's actual performance. For example, the "coaching plan" required Donnell to exhibit success in areas he had recently been

rated as "Strong" and required Donnell to complete tasks that were not in his job description or had only recently been added.

56. In May 2018, Donnell was told he would be placed on a performance improvement plan ("PIP").

57. Seeing the writing on the wall, Donnell sought an internal transfer and was told by managers in other departments that they wanted to hire him.

58. Capital One refused to allow Donnell to transfer to other positions while he was on a "coaching plan" despite the wish of a hiring manager who was familiar with his skills and abilities to perform the job.

59. Capital One's refusal was based on the company's No-Transfer Policy that prohibits any employee with documented performance issues, an "Inconsistent" year-end rating, or an active Performance Improvement Plan (PIP) and/or Conduct Memo from even applying for a transfer within Capital One.

60. Donnell's employment with Capital One was terminated effective July 10, 2018.

61. Capital One's justification for Donnell's "coaching plan" and PIP were false.

62. Donnell was not a poor performer.

63. The "coaching plan" and PIP were pretextual and false, and were issued in order to meet Capital One's "forced distribution" requirement in order to increase involuntary attrition.

64. Upon information and belief, other older employees, who were also objectively strong performers, were also targeted and terminated by Capital One around the same time as Plaintiff.

65. Capital One's process and policy of increasing involuntary attrition in the manner set forth herein (through "performance management" and job eliminations), is a facially neutral

policy that has a disparate impact on employees over age 40 across all lines of business at Capital One.

66. Such policy is an employment termination program under the OWBPA that affects two or more employees.

67. Upon the termination of Donnell, Defendants provided, and Donnell signed, a Letter of Agreement ("Agreement") which provided him severance pay in exchange for waiving certain claims against Defendants. Capital One has a copy of this Agreement which is substantially similar to the Agreement in *Hutchens v. Capital One*, Case No. 3:19-cv-546 (ECF No. 1-1).

68. Upon the termination of Plaintiff and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided.

69. Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

### Count 1 – OWBPA

70. OWBPA claims may not be released.

71. ADEA claims may not be released unless they comply with the OWBPA.

72. Capital One's Letter of Agreement did not comply with OWBPA.

73. The policy alleged herein was an "employment termination program" affecting two or more employees.

74. The Agreement provided to Plaintiff and others did not provide 45 days to consider the waiver of any rights or claims under the ADEA.

75. The Agreement provided to Plaintiff and others did not provide the job titles and

ages of all individuals selected or not selected for termination under such policy alleged herein.

76. The Agreement was not a "knowing and voluntary" waiver of Plaintiff's rights and claims under the ADEA.

77. Plaintiff is entitled to declaratory, equitable, and/or injunctive relief based on Capital One's OWBPA violation including but not limited to: age and job title data across the applicable line(s) of business, data reflecting "involuntary attrition" rates, other statistical data relating to these claims; an order declaring Capital One in violation of OWBPA and permitting Plaintiff to proceed with his claim under the ADEA, without retaliation and without being in breach of the Letter of Agreement; an award of attorneys' fees and costs; and other equitable, injunctive, and/or declaratory relief requested below.

78. The party asserting the validity of an OWBPA waiver has burden of proof that it was "knowing and voluntary." 29 USC § 626(f)(3).

79. Capital One cannot prove that the Agreement was knowing and voluntary.

## Count 2 – ADEA

80. Capital One discriminated against Donnell because of his age, 58.

81. But for Donnell's age, he would not have been the subject of negative feedback, been denied an internal transfer, and been selected for termination from employment.

82. Capital One disparately treated Donnell and other older associates, and treated younger employees more favorably, in the forced ranking and termination of older employees.

83. Capital One's disparate treatment of Plaintiff and older employees was willful.

84. Capital One's policies also had a disparate impact on older employees. Specifically, Capital One's policy to increase the rate and percentage of "involuntary attrition," which was implemented through a "performance management" policy which required forced or

"stack" rankings to create a pool from which "involuntary" terminations were implemented, was the standard operating procedure at Capital One. This policy had a disparate impact on Capital One employees over age 40. The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including CRP hires.

85. Donnell was disparately impacted because of his age by Capital One's policies which resulted in his termination.

86. Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

## Relief Requested for OWBPA

Wherefore, Plaintiff requests the Court grant the following Relief:

A. Issuance of an Order finding that Capital One did not comply with the OWBPA;

B. Declaring that Capital One's policy, as alleged herein, was an "employment termination program" under OWBPA;

C. Declaring that the "Letter of Agreement" does not comply with the OWBPA, that the waiver contained therein was not "knowing and voluntary," and that Plaintiff may proceed with his ADEA claim;

D. An Order directing Capital One to comply with OWBPA, including producing the ages and job titles of employees who were selected and /or non-selected for termination under the policy alleged herein, which should have produced under OWBPA;

E. An Order directing that notice be delivered to all Capital One employees involuntarily terminated under the policy alleged herein, who signed a Letter of

Agreement, informing them that their waivers are invalid and that those employees may have ADEA claims;

  F. attorneys' fees; and

  G. any and all further relief permissible by law.

### ADEA Relief Requested

Wherefore, Plaintiff requests the following Relief against Defendants:

  A. Court order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management calibrations, forced rankings, involuntary terminations, new hires, and any other employment data relevant to Plaintiff's disparate impact claim;

  B. money damages suffered by Plaintiff as a result of Capital One's age discrimination of Plaintiff, including but not limited to lost pay, benefits, and if the Plaintiff received Capital One's "Performance Benefit Structure" severance, then the difference in severance benefits between that which Plaintiff received, and the greater sum of the "Restructuring Benefit Structure" which Plaintiff should have received as a result of the policy alleged herein;

  C. liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violation of the ADEA;

  D. pre-judgment and post-judgment interest;

  E. reasonable attorney's fees and costs expended in the prosecution of this case;

  F. any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this

case.

                                Respectfully submitted,
                                **David Michael Donnell**
                                Plaintiff

By:_____/s/_____
            Harris D. Butler, III (VSB No. 26483)
            Craig J. Curwood (VSB No. 43975)
            Paul M. Falabella (VSB No. 81199)
            Butler Curwood, PLC
            140 Virginia Street, Suite 302
            Richmond, Virginia 23219
            Tel: 804-648-4848
            Fax: 804-237-0413
            Email: harris@butlercurwood.com
                        craig@butlercurwood.com
                        paul@butlercurwood.com

            *Attorneys for Plaintiff*